IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 18, 2025 Session

**STATE OF TENNESSEE v. RONALD EUGENE FOX, II**

**Appeal from the Criminal Court for Knox County**
**No. 120556   Steven W. Sword, Judge**

————————————————

**No. E2024-01374-CCA-R3-CD**

————————————————

Defendant, Ronald Eugene Fox, II, appeals his Knox County Criminal Court jury convictions of first degree murder, tampering with evidence, and initiating a false report. He challenges the sufficiency of the convicting evidence for his first degree murder conviction, the trial court's denial of his motion to continue, and the trial court's refusal to instruct the jury on voluntary manslaughter as a lesser included offense of first degree murder. Defendant also argues that the cumulative effect of the errors at trial warrants reversal of his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

Dillon E. Zinser, Knoxville, Tennessee, for the appellant, Ronald Eugene Fox, II.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Hill and Cameron Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Defendant's convictions arose from the May 22, 2021 shooting death of his girlfriend, Constance Danyell Davison ("the victim"), inside her Knoxville home.

1

**Factual and Procedural Background**

The Knox County Grand Jury charged Defendant via a three-count presentment with one count of premeditated first degree murder, *see* Tenn. Code Ann. § 39-13-202(a)(1)(a); one count of tampering with evidence, *see id.* § 39-16-503(a)(1); and one count of initiating a false report, *see id.* § 39-16-502.

I. Motion Hearing

Defendant twice moved the trial court to continue his trial. The trial court granted the first continuance on December 12, 2022, and reset the trial for May 1, 2023. Defendant filed his second motion on April 4, 2023, asserting that he had been unable to obtain a digital forensics expert to assist trial counsel with the analysis of the cell phone data that the State had disclosed during discovery. Counsel explained the difficulties he encountered when attempting to locate an expert within the radius and hourly rate limitations imposed by the Administrative Office of the Courts ("AOC") for indigent criminal defendants. Counsel stated that although the trial court had approved his funding request, the final approval was then pending with the AOC. Counsel said that, even after the funding was approved, the expert would have to review all the cell phone data turned over by the State, the most recent of which was disclosed to the defense on March 17, 2023. Counsel argued that the cell phone data was crucial to his case and to his providing a constitutionally sufficient defense.

At the April 11, 2023 hearing on Defendant's motion, trial counsel indicated that he had received more cell phone data on April 5, 2023, and that his expert had begun work on the case but could not be prepared by the May 1, 2023 trial date. Counsel again stated that the cell phone data was vital to his defense.

The State asked the trial court to deny the motion to continue, arguing that the cell phone data was essentially cumulative. The State acknowledged that it had "provided underlying data late in the game" but said that the additional data did not alter the fact that the cell phone data was not of great importance.

Defendant responded that the location data was less important than the timeline that could be created from the cell phone data, which he said would "make a big difference in the jury's mind." Counsel said that it was possible that the defense expert would come to the same conclusions as the State but that for Defendant to be afforded a fair trial, the defense expert should at least be given the opportunity to review the information.

The trial court expressed concern about continuing the case when it was possible that the defense would not even use the information and about violating the state constitutional right to speedy trial for victims. The court asked counsel to communicate with the expert to determine whether he could be ready by the May 1, 2023 trial date. The court set the motion for another hearing on April 25, 2023.

2

At the April 25, 2023 hearing, Defendant presented the sworn statement of his expert, John Morris, articulating the reasons that he needed more time to be prepared for trial. The State asserted that it did not intend to use the cell phone extraction data to pinpoint Defendant's location but only "to show what calls he made and a few outgoing text messages from the phone." Defendant argued that the location data was important because it portrayed the relevant timeline before Defendant called 911 to report that the victim had been shot. Defendant also argued that the defense expert wanted to perform a second extraction because there was "other information that may not have been extracted by law enforcement" that the expert "could, potentially" uncover through the phone analysis.

The trial court concluded that the mere potential that the defense expert would uncover important information was too speculative to allow the court to find good cause to grant the motion to continue and, accordingly, denied it.

## II. Trial

Just shy of 11:45 p.m. on May 22, 2021, Defendant called 911 to report that he had discovered the victim inside the home they shared and that she had been shot. When authorities arrived on the scene, they discovered the victim slumped over on her knees behind the door of the laundry room in a pool of blood. She had no readily visible injuries but was clearly deceased. Upon rolling the victim onto her back, police observed two gunshot wounds to the victim's head; one shot struck the victim in the chin, and another struck the top of her head. Police observed no signs of forced entry, and the presence of the victim's keys, wallet, and $265 cash suggested that robbery was not a motive for the shooting.

The victim's daughter, Rajai Davison, who lived with the victim and Defendant, testified that on May 22, 2021, Defendant and the victim argued after the victim returned from having her hair done, but Ms. Davison did not know the subject of the argument. Ms. Davison left for work at approximately 5:30 p.m. and expected to see Defendant later because he had promised to bring her food on her break. Defendant did not bring her food, and at approximately 9:30 p.m., the victim called Ms. Davison and told her that she and Defendant had broken up, "that he was leaving[,] and that she was just done with him." During the call, the victim told Ms. Davison that she was driving to her friend Shemeka Brown's house to give her some muscle cream, and their conversation ended when the victim arrived at Ms. Brown's house. Sometime after midnight, police arrived at Ms. Davison's place of work and told her that they were going to take her to the police station. While she was at the police station, Ms. Davison called Ms. Brown, who told her that there were police cars at her house. Shortly thereafter, police told Ms. Davison that the victim was dead.

Later that morning, Defendant called Ms. Davison and told her that he called 911 after he returned home to find that the victim had been shot. He said he discovered her lying on the floor. Ms. Davison initially believed Defendant but asked him why he left the victim on the ground for more than an hour as she had been told by investigators. She said that Defendant "was startled" and that "he couldn't believe that she was on the ground for an hour."

Ms. Davison testified that visitors to the home typically used the back door and that the front door was kept locked. Although the home was equipped with video cameras that captured live video of the front and back entrances of the house, the camera did not store recordings because they had not placed an SD card inside.

During cross-examination, Ms. Davison acknowledged that there had been a drive-by shooting at the house approximately ten years before the victim's death. She also recalled a shooting at a nearby event on New Year's Eve 2020 that ended with Defendant being shot, an undated incident when someone shot at Defendant's vehicle at a nearby intersection, and an undated incident when someone shot into Defendant's mother's house while he was inside.

Ms. Brown testified that she spoke to the victim a short time before her death when the victim offered to bring Ms. Brown some muscle cream to help with her knee pain. While she was on the phone with the victim, Ms. Brown overheard the victim say to someone in the background, "Damn, you still mad? I'm sick of this bull****." The victim arrived with the muscle cream approximately fifteen minutes later. Instead of coming inside, as was her custom, the victim gave the cream to Ms. Brown's daughter and left.

Ms. Davison, Ms. Brown, and Ms. Davison's girlfriend, Iyana Mack, testified that Defendant typically carried a firearm everywhere he went. Ms. Davison described the weapon as a black handgun with an "extended clip and a laser on it." Ms. Mack similarly described the firearm as a black nine-millimeter handgun with an extended clip and a laser. Ms. Mack specifically recalled seeing Defendant with the firearm on the day of the victim's death. Ms. Brown described the firearm as a silver nine-millimeter handgun with "a long piece on the end." All three women testified that the victim did not carry a firearm.

The victim's seventeen-year-old neighbor testified that on May 22, 2021, he and his family attended a cookout at the lake and that when they returned, he put a cooler containing drinks on the front porch of his house. When he went outside to get a drink between 9:00 p.m. and 10:00 p.m., he heard gunshots but did not call 911 because it was not uncommon to hear gunshots in the neighborhood. He said that he could not tell where the shots came from but that they sounded close by.

Knoxville Police Department ("KPD") Officers Luis Vazquez and J.D. Hopkins responded to the call of a shooting at the victim's residence. Officer Vazquez, who was the second police officer to arrive, testified that he observed the victim's body behind the door

4

of what appeared to be a laundry room. Recorded footage from Officer Vazquez's body worn camera ("BWC") was exhibited to his testimony and played for the jury. The recording included footage of Officer Vazquez's brief discussion with Defendant, who the officer agreed was upset. Recorded footage from Officer Hopkins' BWC was exhibited to his testimony and played for the jury.

KPD Investigator Tim Riddle also responded to the call of a shooting at the victim's residence and went on to lead the investigation into her death. He recalled that officers initially reported that the shooting "resembled a suicide." When he arrived, Defendant was outside, and the victim, who had been declared deceased, was slumped over "in a fetal position behind the door" of the laundry room with no visible signs of injury. After the victim was rolled over, the investigator observed visible gunshot wounds to the victim's head. A large amount of blood had pooled beneath her, seeped into the subfloor, and run "out to the back porch area" of the house.

The investigator also observed a spent shell casing laying on the jacket that had been underneath the victim's body. No firearm was located near the victim's body or anywhere else inside the house. Investigator Riddle and other officers searched the victim's house for signs of forced entry but found none. The security camera was not equipped with the means to store the footage, so Investigator Riddle was unable to review any images the camera may have captured. Additionally, the investigator found no indication that the victim had been robbed given that cash and her personal effects were found with her.

Investigator Riddle and Former KPD Investigator Brandon Wardlaw conducted the initial interview of Defendant. The video recording of the interview was exhibited to Investigator Wardlaw's testimony and played for the jury. Defendant was not placed under arrest following the initial interview.

Investigator Riddle recalled that in his first interview, Defendant said that he left the residence he shared with the victim at approximately 9:00 p.m. to go visit his mother, Patricia Harvey, and that he did not return until just before calling 911, which was at 11:42 or 11:43 p.m. Investigator Riddle spoke with Ms. Brown, Ms. Davison, and Ms. Harvey, and those conversations allowed him to develop a timeline of events leading to the victim's death.

Defendant stated that he had run errands with his mother before she dropped him off to visit his ex-girlfriend, Christina Matthews. Based upon this information, Investigator Riddle elected to obtain the registration information for Ms. Harvey's car, a dark blue Toyota Camry. Utilizing the "Flock" System, a tool that captures vehicles' license plates as they drive through "high volume intersections" in the city, the investigator obtained images of Ms. Harvey's car traveling through the intersection of Cherry Street and Magnolia on May 22, 2021, at 7:42 p.m. and again at 11:03 p.m. The investigator explained

that Ms. Harvey would have crossed through that intersection to get from her home to the victim's home.

Investigator Wardlaw testified that he initially met Defendant when Defendant was shot in the "upper chest/arm area" and taken to the hospital on New Year's Eve 2020. The investigator recalled that while Defendant was at the hospital, Dejuan Vineyard arrived at the same hospital with a gunshot wound to the stomach. Mr. Vineyard met the physical description of the shooter provided by Defendant but claimed that he had been struck by a firework. Defendant was not cooperative with the ongoing investigation and was primarily concerned with recovering his clothing from his car. When Investigator Wardlaw went with Defendant to collect his clothing from his car at the impound lot, he observed shell casings with "a distinct red mark on them, like maybe red fingernail polish" in the clothing and "a bag of ammo with the same red markings" in the console of the vehicle.

Investigator Wardlaw acknowledged that Defendant told him during his initial interview that two days before the victim's death he had seen the same man who shot him in 2020 driving a gray Dodge Charger and carrying a nine-millimeter handgun. The investigator said that he was unable to identify that person, however, because Defendant "never identified to me who the person was that shot him." He stated that he did not interview Mr. Vineyard in connection with the victim's death.

Defendant voluntarily surrendered his cell phone to the police and gave them consent to search the phone. KPD Investigator Anthony Delalla performed a cell phone extraction on Defendant's cell phone using a program called Cellebrite, which produced a large amount of raw data that he used to generate two reports: one for instant messages and one for phone calls during a six-hour period on May 22, 2021. Both reports were exhibited to the investigator's testimony. Police also collected the victim's cell phone from the scene, but neither the investigator nor forensic examiners from the Tennessee Bureau of Investigation ("TBI") were able to perform an extraction of the data from the victim's phone because it was saturated in blood. The investigator extracted data from the phone's SIM card and generated a report that contained "very minor information."

Because he was unable to extract precise location data from Defendant's cell phone, Investigator Riddle obtained a search warrant for the cell tower location data for both Defendant's phone and Ms. Harvey's phone. The call logs for both Defendant's and Ms. Harvey's cell phones, which showed multiple calls between Defendant and Ms. Harvey between 9:00 p.m. and 11:45 p.m., were inconsistent with Defendant's version of events. Additionally, the location data from the cell phone towers was inconsistent with Defendant's claim he was at his mother's house from 9:00 p.m. to 11:45 p.m.

Officers searched Ms. Harvey's residence pursuant to a warrant on May 26, 2021. During their search, they "located one small caliber revolver" in Ms. Harvey's room, but that was "not the specific kind of gun [they were] looking for." Based upon the shell

casings recovered from the scene, officers were looking for "a 9-millimeter semi-automatic gun." Investigator Riddle said nothing relevant to the investigation was recovered from Ms. Harvey's home.

Defendant came into the police station on June 1, 2021, to provide a second voluntary statement in connection with the investigation. The video recording of that statement was exhibited to Investigator Riddle's testimony and played for the jury. During his second statement, Defendant reported that he entered the victim's house and heard her call his name. He told officers that he walked to the back of the house to find "a guy dressed in all black" and that he and the victim had "boxed" the masked intruder in the laundry room. Investigator Riddle confronted Defendant with the call log from his cell phone, which indicated that he called his mother at 10:55 p.m. and did not call 911 until 11:42 p.m.

Investigator Riddle returned to Ms. Harvey's residence on June 17, 2021, to take photographs of the contents of several trash bags that were located just inside the back door of the residence to confirm his belief that Defendant "was moving out of the residence." He said that although the bags were photographed on the night of the shooting, he initially believed they contained trash. Photographs of the contents of the bags showed that they contained toiletries, a clipper set, watches, and mail. The investigator said that the contents of the bags suggested that Defendant was not simply going to Ms. Harvey's home to do laundry as he had claimed.

Investigator Riddle testified that Defendant had provided him with the names of individuals who might have wanted to kill him and that officers "looked into" those individuals. Investigator Riddle said that although Dejuan Vineyard had been a suspect in the 2020 shooting of Defendant, there was no evidence that Mr. Vineyard was involved in the shooting death of the victim. Defendant had provided officers with the name "Drea," but with no last name to go on, they were unable to locate any specific individual. At that point, Defendant became a suspect in the victim's death based on the inconsistencies in his stories. The investigator's suspicions were heightened when he received the results of the gunshot residue testing performed on Defendant's clothing in July 2021. Investigator Riddle then asked KPD Officer Brian Dalton, an expert in tool marks and firearms, to examine the shell casings recovered from the scene. He said no evidence pointed to anyone other than Defendant having shot the victim.

During cross-examination, Investigator Riddle said that he investigated the possibility that two other individuals named by Defendant had been involved in the victim's shooting but that "no physical evidence" connected those men to the victim's murder. The investigator acknowledged that he did not attempt to interview either of the men. Similarly, he did not attempt to interview Mr. Vineyard or to determine the kind of vehicle that Mr. Vineyard drove.

Former KPD crime scene technician Moeana Franklin, who took photographs and collected evidence, testified that she did not observe any signs of forced entry inside the victim's home. She saw the victim inside the laundry room slumped over, face down on her knees in front of the washing machine. Ms. Franklin said that the position of the victim's body was inconsistent with life-saving measures having been attempted. After the medical examiner arrived, the victim was turned onto her back, and, at that point, officers observed "gunshot defects in her head" that were not previously visible. Two shell casings were collected from a jacket underneath the victim's body, and a projectile was removed from the wall adjacent to where the victim was found. Ms. Franklin collected a tank top and T-shirt from the couch inside the living room of the victim's house.

After leaving the scene, Ms. Franklin went to the police station, where she photographed Defendant and collected his clothing and shoes. She then went to the medical examiner's office, where she collected the victim's clothing, nail clippings, a DNA sample, and a projectile that was removed from the victim's body during the autopsy.

Dr. Lauren Havrilla, assistant medical examiner at the Knox County Regional Forensic Center, testified regarding the autopsy of the victim that was performed by Dr. Travis Danielson, who was no longer employed at the Forensic Center. Dr. Havrilla reviewed Dr. Danielson's autopsy report, the photographs taken during the autopsy and at the scene, the written report of the "medical legal death investigator," and the toxicology report. Based upon her review, she adopted the conclusions drawn by Dr. Danielson that the victim died from the gunshot wounds to her head and torso and that the manner of death was homicide. One round entered the victim's head on "the left side of the chin," quickly exited, "and then quickly reentered the body" and "continued to travel towards her back on the right side." The bullet "was recovered from the back right side" of the victim's body "behind the ribs." Stippling around that wound indicated that "the gun was between a few inches and a few feet away" from the victim when it was fired. The trajectory of the gunshot to the victim's chin suggested that the victim "was slumped over or crouched down" when she was shot. The other round struck the top of the victim's head and "traveled through the skull, through the right side of the brain, through the base of skull, sort of back behind [the victim's] nose, through the back of the throat, and then out the left side of the neck." The doctor said that the trajectory of that wound suggested that it was possible that the victim "was crouched down in a lower position" when she was shot. Dr. Havrilla said that, based upon the totality of the evidence she reviewed, the victim "likely sustained the gunshot wound to the jaw first and then sustained the gunshot wound to the top of the head."

Dr. Havrilla opined that the victim likely would have lost consciousness within "seconds to a few minutes" and would have lived only minutes after having been shot. Additionally, injuries to the upper part of the victim's spinal cord "may have caused paralysis of the lower half of" her body. Examination of the victim's stomach revealed that she had not eaten in the few hours prior to her death.

8

Defendant's mother, Ms. Harvey, testified that on the day of the victim's murder, Defendant called to invite her to dinner. Defendant then called her and told her that something had happened at the victim's residence and asked her to pick him up. Ms. Harvey recalled that Defendant "was scared to death, and he was just really, really terrified at that time." Ms. Harvey picked Defendant up near "Jarnigan's" because she said she "was scared to go to where he was" and drove him to her house. She said that she did not know what Defendant did for the ten minutes that they were inside her house because she went to the bathroom at the "other end of the home." Ms. Harvey said that while they were at her house, she did not leave to go get Defendant a beer or "something to smoke." She also denied taking Defendant to "Christina's house" or watching a movie with Defendant that night. After approximately ten minutes, Ms. Harvey took Defendant back to "Jarnigan's" because she did not want to go to the scene. Defendant told Ms. Harvey at that point "that he was going back home" and that he was going to call the police. Ms. Harvey spoke with Defendant a third time by phone, and Defendant was "screaming and hollering." She heard the police in the background during that conversation. Sometime later, she went to the scene with some of her other children to comfort Defendant.

During cross-examination, Ms. Harvey recalled that Defendant was shot in the chest on New Year's Eve, but she could not recall the year. Ms. Harvey also recalled that her own house had been the scene of a shooting approximately three months before the victim's death. Ms. Harvey said that Defendant appeared scared on the night of the victim's murder and that she herself had "been nervous that night and a whole lot of nights" about other people harming her.

TBI Special Agent and Forensic Scientist Lindsey Anderson testified as an expert in the field of microanalysis that she performed an examination of the shoes, shirts, shorts, and belt that she received from the KPD in this case. She "confirmed multiple particles of gunshot residue" on all the items. She explained that "[t]he presence of gunshot primer residue will associate an individual or an item with a firearm discharge," meaning that "they either discharged the firearm," that they were "nearby when the firearm was discharged," or that they came "into contact with something else that had gunshot residue on it, via the recently fired pistol."

Officer Dalton testified as an expert in forensic firearms and tool mark examination that he examined the shell casings and bullets recovered in relation to this case. He determined that the two nine-millimeter Luger shell casings recovered from the scene were fired from the same firearm. Additionally, he determined that the bullet recovered from the scene and the bullet recovered from the victim's body were fired from the same firearm. He stated that it was impossible to determine whether the casings and bullets were all fired from the same firearm. Although he was not provided with a firearm to examine in this case, he was able to create a list of firearms that could have fired the bullets based on the "caliber, diameter, number of lands and grooves, the widths of those lands and grooves,

and the direction of twists, left or right," and a copy of his report was exhibited to his testimony.

Following Officer Dalton's testimony, the State rested. The trial court denied Defendant's motion for a judgment of acquittal, and, following a full *Momon* colloquy, Defendant elected not to testify but chose to present proof.

John Morris testified on behalf of Defendant as an expert in the field of digital forensics that he reviewed the cell tower data records and cell phone extraction data in this case. Mr. Morris explained that cell towers "are not location devices" because many factors determine whether a cell phone connects to a specific tower, including "signal strength, traffic," and topographical features such as mountains. He said that although cell towers were useful in providing a broad location, they become "less and less useful" as you work down into smaller geographic areas. He opined that given that all the cell towers in this case "were within more or less a mile or so of each other" and given "the range that cell phone towers can work," using the cell tower data would not be useful to determine location within such a small area. Mr. Morris explained that although cell phone providers could provide "more advance[d] records" from which a more accurate location could be determined, such a calculation could not be made from the records that were provided in this case.

Mr. Morris said that he was surprised when the State's digital forensic expert indicated that they did not receive any app data from the extraction of Defendant's cell phone because Cellebrite is "an industry standard tool used by law enforcement" that should return "more than just text messages and phone logs." He said that apps such as Facebook, Instagram, Twitter, and Maps not only record data but also "very often" provide "very specific GPS data."

During cross-examination, Mr. Morris testified that he "never received the entire Cellebrite extraction" from Defendant's cell phone and that, in any event, examination of the entire extraction "would have taken considerably more time than we had given the late hour at which I became involved." He said that most attorneys would not know what to do with the data from a full Cellebrite extraction and that it would take "someone looking at that report to even know what's there and what could be relevant." Mr. Morris reiterated that although cell tower data was useful to determine general location, "the more granular you get, the less reliable it is for that purpose." He said that "engineering data" from the cell towers would include "a 'confidence interval,'" which could provide more accurate location data. Mr. Morris explained that divining location from old cell tower data was "a completely different process" than the one utilized by law enforcement when they are actively trying to locate someone, which could be "very, very accurate."

Mr. Morris said that software designed to translate location data into map format was not designed to provide more accurate location information but instead provided

information regarding the location of the tower connected to the cell phone and the direction that the connected antenna was facing. He added, "The tool is not purporting to give you a location of the device" because "[t]hat is not how those tools work." He said that even with engineering data, precise geolocation was not possible. Instead, it would give only a general area where the phone was located. He said that cell "tower data is very dangerous to use when you're trying to say someone was at a specific location" and should not be the basis for a conviction. Mr. Morris testified that, given the .9 mile distance between Ms. Harvey's residence and the victim's residence, "it would be very consistent with the way cell phones work that a person could be at either location at any time and be hitting off the same batch of towers." He said, "[W]ith the distances that we were looking at in this case, there's nothing you can tell from that tower data that gives you any indication about where between those points anybody was."

Based upon this evidence, the jury convicted Defendant as charged of premeditated first degree murder, tampering with evidence, and initiating a false report. Because the State did not pursue a sentence of death or life without the possibility of parole, Defendant was automatically sentenced to life in prison.[1] *See* Tenn. Code Ann. § 39-13-202(c)(1) (providing that available sentences for a person convicted of premeditated first degree murder are death, life imprisonment without the possibility of parole, and life imprisonment); *id.* § 39-13-208(c) (2021) ("If notice is not filed pursuant to subsection (a) or (b), the defendant shall be sentenced to imprisonment for life by the court, if the defendant is found guilty of murder in the first degree.").

Following a sentencing hearing, the trial court imposed concurrent, Range II sentences of ten years for Defendant's conviction of evidence tampering and eight years for Defendant's conviction of initiating a false report to be served concurrently with Defendant's life sentence.

### III. Motion for New Trial

Defendant filed a timely motion for new trial in which he challenged, among other things, the sufficiency of the convicting evidence and the trial court's denial of his motion to continue. In his Amended Motion for New Trial, Defendant added as grounds for relief,

---

[1] Defendant refers to his sentence as "life in prison with the possibility of parole," but, as this court has explained, that description "is inaccurate because a defendant sentenced to life" for an offense committed after July 1, 1995, but before July 1, 2024, "is entitled 'to be released, as opposed to being paroled, after serving 100 percent of sixty years less any eligible credits so long as they do not operate to reduce the sentence by more than 15 percent, or nine years.'" *Williams v. State*, No. W2013-00555-CCA-R3-HC, 2013 WL 5493568, at *2 (Tenn. Crim. App. Sept. 30, 2013) (quoting *Penley v. State,* No. E2004-00129-CCA-R3-PC, 2004 WL 2439287, at *3 (Tenn. Crim. App. Nov. 1, 2004)); *see also State v. Miller*, 638 S.W.3d 136, 153 n.14 (Tenn. 2021) (citing this court's "explanation of the difference between 'imprisonment for life' and 'life imprisonment without possibility of parole," and "why '[a]rguably, there is no 'parole' from a sentence of imprisonment for life.'" (citing *State v. Miller*, No. W2019-00197-CCA-R3-DD, 2020 WL 5626227, at *12 (Tenn. Crim. App. Sept. 18, 2020)).

among other things, the trial court's failure to charge voluntary manslaughter as a lesser included offense of first degree murder and the cumulative effect of the errors at trial.

Neither party presented live evidence at the hearing on the motion and chose to rely solely on argument. Defendant argued that the State failed to establish sufficient evidence of premeditation to support his conviction of first degree premeditated murder. He also argued that the trial court erred by denying his second request to continue the trial so that Mr. Morris could perform a more thorough review of the cell phone data in the case. Defendant asserted that the trial court should have provided a jury instruction on voluntary manslaughter based on the State's theory that Defendant and the victim argued and ended their relationship just before the victim was murdered.

At the conclusion of the hearing, the trial court denied Defendant's motion for new trial. This timely appeal followed.

**Analysis**

On appeal, Defendant argues that the evidence was insufficient to support his conviction of first degree murder, that the trial court erred by refusing to continue the trial so that the defense expert could review the cell phone data, that the trial court erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense of first degree murder, and that the cumulative effect of the errors at trial entitles him to relief.

I. Sufficiency of the Evidence

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-

weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally for purposes of Code section 39-13-202(a)(1) "when it is the person's conscious objective or desire to cause the death of the alleged victim." *State v. Reynolds*, 635 S.W.3d 893, 915 (Tenn. 2021) (citing Tenn. Code Ann. § 39-11-302(a) (2018)). As used in the statute, "[p]remeditation 'is an act done after the exercise of reflection and judgment.'" Tenn. Code Ann. § 39-13-202(e). Although "'[p]remeditation' means that the intent to kill must have been formed prior to the act itself," the State need not establish "that the purpose to kill preexist[ed] in the mind of the accused for any definite period of time." *Id.*

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also Reynolds*, 635 S.W.3d at 916. The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

> (1) The use of a deadly weapon on an unarmed victim;
> (2) The particular cruelty of the killing;
> (3) Threats or declarations of the intent to kill;
> (4) The procurement of a weapon;
> (5) Any preparations to conceal the crime undertaken before
> the crime was committed;
> (6) The destruction or secretion of evidence of the killing;
> (7) Calmness after the killing;
> (8) Evidence of motive;
> (9) The use of multiple weapons in succession;
> (10) The infliction of multiple wounds or repeated blows;
> (11) Evidence that the victim was retreating or attempting to
> escape when killed;
> (12) The lack of provocation on the part of the victim; and
> (13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). The jury, as the trier of fact, "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)). Thus, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)).

The evidence adduced at trial established that the unarmed victim suffered two nine-millimeter gunshot wounds to her head as she was in the laundry room of her own home, and there was no evidence that the victim did anything to provoke Defendant. Ms. Davison, Ms. Brown, and Ms. Mack testified that Defendant regularly carried a nine-millimeter handgun, and Ms. Mack testified that she saw Defendant with the weapon on the day of the murder. The victim was crouched behind the laundry room door when police arrived on the scene. Medical testimony established that the victim suffered two close-range gunshot wounds while she was in a crouching position, the first striking her in the jaw and the second striking her in the top of her head. A search of both the victim's and Ms. Harvey's residences failed to yield Defendant's nine-millimeter handgun that he regularly carried.

The victim and Defendant argued on the day of the murder, and the victim had asked Defendant to leave the residence. Bags filled with Defendant's belongings suggested that Defendant was in the process of moving out. Ms. Davison and Ms. Brown confirmed that the victim was upset that evening. The victim ended a phone call with Ms. Davison when she arrived at Ms. Brown's house at approximately 9:47 p.m., and no one heard from the victim after she left Ms. Brown's house only a few minutes later.

Defendant claimed that he spent the evening doing laundry and running errands with his mother before coming home to find the victim shot to death, but cell phone call logs and Ms. Harvey's testimony belied Defendant's claim. Defendant called his mother at 10:55 p.m. and asked her to pick him up from the victim's residence because something had happened at the victim's house. Ms. Harvey testified that she picked up Defendant at a nearby location, and Defendant remained at her house for only ten minutes before he asked her to take him back to the victim's house and that she did not know what he did during that time. Defendant told his mother that he planned to call the police, but the evidence established that Defendant did not call 911 until 11:42 p.m., when he reported that the victim had been shot to death. However, other evidence indicated that the initial position of the victim's body inside the laundry room made it impossible to tell that she had been shot, a fact confirmed by photographs from the scene. Moreover, by the time police arrived, the victim had been dead for some time. Indeed, blood had not only pooled beneath her body but had seeped through the floor. Gunshot residue testing confirmed that Defendant had been in close proximity to a firearm on the night of the victim's death.

After realizing that the physical evidence could not support his original story to 911 and to the police, Defendant claimed that he had been in the room when the victim was shot by a man dressed in all black. Defendant did not identify the man, however, and gave police only the first names of people who possibly could have shot the victim. Further, the position of the victim's body conclusively established that Defendant did not attempt any life saving measures or attempt to render aid after the victim was shot.

14

In our view, this evidence supports Defendant's conviction of first degree premeditated murder. The State established Defendant's identity as the perpetrator through circumstantial evidence. Other evidence established that the victim was unarmed, that Defendant shot her twice, there was a lack of provocation, that Defendant failed to render aid or timely summon help, and that he made efforts to conceal the crime afterwards. *See Reynolds*, 635 S.W.3d at 916-17 (citations omitted).

Defendant does not challenge the sufficiency of the evidence for his remaining convictions.

## II. Motion to Continue

Defendant asserts that the trial court abused its discretion by denying his second motion to continue, arguing that the court's failure to grant the continuance deprived him of "valuable and abundant information potentially on his phone." The State contends that the trial court properly denied a continuance given the speculative nature of Defendant's claim and that, in any event, Defendant has failed to establish actual prejudice from the denial.

Because the decision to grant or deny a continuance "rests within the sound discretion of the trial court," this court "will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial." *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008) (first citing *State v. Odom,* 137 S.W.3d 572, 589 (Tenn. 2004); and then *State v. Russell,* 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999)). To demonstrate an abuse of discretion, the defendant must show "that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Id.* (citing *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)).

Defendant asked the trial court to grant a continuance so that Mr. Morris could complete a full review of the Cellebrite extraction of Defendant's phone. In his affidavit, Mr. Morris stated that extraction records provided by the State could not be used to track movement within a small geographic area and that further analysis of Defendant's cell phone, which was in the possession of the State, as well as data produced by and stored by various providers such as Facebook, Twitter, and Instagram could be helpful to the defense. Mr. Morris did not affirmatively suggest that such information was available, only that such information could be obtained. Despite the court's having two hearings on the motion, Defendant failed to specify what, if any, evidence he expected Mr. Morris to uncover either on Defendant's cell phone or from the various providers. Given that the phone and the accounts belonged to Defendant, he presumably knew what information regarding his communications and app usage on the day of the murder was available that he believed would or could have been exculpatory or valuable to his case. Furthermore, as the owner of the accounts mentioned by Mr. Morris, Defendant could have obtained the data from

those accounts even without the assistance of an expert witness. "Social media websites like Facebook make it easy for users to download their own account information, so much of the information stored in a social media account is easy to access." *See* Agnieszka A. Mcpeak, *The Facebook Digital Footprint: Paving Fair & Consistent Pathways to Civil Discovery of Soc. Media Data*, 48 Wake Forest L. Rev. 887, 892 (2013); *cf. In re Braylee B.*, No. E2020-01408-COA-R3-PT, 2021 WL 1977187, at *9 (Tenn. Ct. App. May 18, 2021) (concluding that trial court did not abuse its discretion by denying motion to continue for Father to obtain information from his own Facebook account when "Father has not provided a convincing reason why he was unable to access his communications to and from Mother through his Facebook account.").

Moreover, Defendant failed to present any evidence (in the form of witness testimony, affidavit, or otherwise) that had a continuance been granted, further examination of his cell phone, social media accounts, or the Cellebrite extraction data would have uncovered information that would have altered the outcome of the trial. *See State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999) ("If the defendant wished to demonstrate prejudice, he could have done so by submitting an affidavit of the [supposed] material witness in support of the motion for continuance or presenting the witness's testimony at the hearing on the motion for new trial"); *State v. Winston*, No. W2021-01315-CCA-R3-CD, 2022 WL 17665684, at *18 (Tenn. Crim. App. Dec. 14, 2022) (defendant failed to show prejudice when he "did not present any proof at the hearing on the motion for new trial establishing that additional time to review the records and conduct a further investigation could have provided additional helpful evidence"). Although Defendant stated at oral argument that Mr. Morris passed away a short time after Defendant's trial, Defendant was not barred from having Mr. Morris or another expert continue to work on his case throughout the trial. Most importantly, given that Defendant acknowledged that he was present when the victim was shot and that Ms. Harvey's trial testimony contradicted Defendant's claim that he had been with Ms. Harvey for most of the evening, Defendant cannot establish that he was prejudiced by the trial court's failure to grant Mr. Morris more time to examine the digital forensic data. Accordingly, Defendant is not entitled to relief on this issue.

Defendant's claim that the trial court's failure to grant a continuance deprived him of the opportunity to have Mr. Morris examine the victim's cell phone, having been raised for the first time on appeal, is waived. *See State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017) ("Generally, issues raised for the first time on appeal are waived."). Moreover, contrary to Defendant's assertions, the evidence established that further digital examination of the victim's cell phone was made impossible by the amount of blood that had soaked into it before it was collected from the scene.

### III.  Jury Instructions

Defendant claims that the trial court erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense of first degree murder as charged in this case. Defendant acknowledges that he did not file a written request for the instruction, but he argues that the State's failure to assert waiver in the trial court results in waiver of the State's argument on appeal.  Defendant also contends that, in any event, the failure to instruct was plain error.

Regardless of whether the State raised waiver in the trial court, Defendant waived plenary review of this issue by failing to file a written request for the instruction.  Tennessee Code Annotated 40-18-110 provides:

> Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived.  Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

Tenn. Code Ann. § 40-18-110(c).  Furthermore, given that the trial court is only required to provide a lesser included offense instruction when one is requested in writing, Defendant cannot establish that "a clear and unequivocal rule of law was breached" and, accordingly, cannot establish plain error.  *See* Tenn. Code Ann. § 40-18-110(b) ("In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge."); *State v. Fayne*, 451 S.W.3d 362, 371 (Tenn. 2014) (stating that failure to request a lesser included offense instruction in writing does not prohibit "consideration of the issue under the doctrine of plain error"); *see also State v. Linville*, 647 S.W.3d 344, 353 (Tenn. 2022) (stating that to establish entitlement to relief via plain error, the defendant must establish, among other things, that "a clear and unequivocal rule of law was breached" (citation omitted)).  Additionally, because the record contains no evidence that the victim engaged in conduct that could be interpreted as adequate provocation, the trial court did not err by refusing to provide the instruction, and none of Defendant's substantial rights was adversely affected.  *See* Tenn. Code Ann. § 40-18-110(a) ("[T]he trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense."); *see Linville*, 647 S.W.3d at 353 (stating that the defendant cannot establish entitlement to plain error relief unless "a substantial right of the accused was adversely affected" (citation omitted)).  Finally, because the jury convicted Defendant of the top charge of first degree premeditated murder even though it was instructed on second degree

17

murder as a lesser included offense, Defendant cannot establish that review of this issue "is necessary to do substantial justice." *Linville*, 647 S.W.3d at 354 (citation omitted); *Moore v. State*, 485 S.W.3d 411, 421 (Tenn. 2016) ("[W]here the jury convicts the defendant of a greater charged offense rather than an immediately lesser offense standing between omitted lesser-included offenses and the offense for which the defendant was convicted, any error from the omission of jury instructions on these other asserted lesser-included offenses is harmless beyond a reasonable doubt because the jury, by finding the defendant guilty of the greater offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses." (citing *State v. Williams,* 977 S.W.2d 101, 106 (Tenn. 1998)).

## IV. Cumulative Error

Finally, Defendant alleges that the cumulative effect of the errors committed at trial entitles him to relief. The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). We have not concluded there was any error that warrants relief, thus, there is nothing to accumulate. Consequently, Defendant is not entitled to relief under the cumulative error doctrine.

## Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

18